UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 15-20724-CIV-SEITZ/TURNOFF

TEDDI VAIRMA,

        Plaintiff,

vs.

CARNIVAL CORPORATION,

        Defendant.
_____/

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER is before the Court upon Defendant Carnival's Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages [DE-53]. Plaintiff was a passenger onboard Defendant's ship when she slipped and fell. Plaintiff injured her ankle and had to undergo surgery to repair it. Plaintiff has alleged a single claim of negligence against Defendant and as part of her remedy seeks punitive damages based on the allegations that Defendant had actual knowledge of the slippery nature of the tiles installed on its ship and made a business decision not to repair the floor correctly. While the Court previously held that punitive damages are recoverable in a maritime negligence action for willful, wanton, or outrageous conduct, Defendant's motion for summary judgment is granted because Plaintiff has not shown that Defendant's actions amounted to willful, wanton, or outrageous conduct.

I.     **UNDISPUTED MATERIAL FACTS**

On November 10, 2014, Plaintiff was a passenger onboard Defendant's ship the *Breeze*. While walking in an area known as the Lido Marketplace, Plaintiff injured herself when she slipped and fell near a beverage station after she "tried to make an abrupt stop" to avoid colliding

with another passenger. The Lido Marketplace is an area where food and drinks are served and the floor is covered in tile. The Lido Marketplace is a large area that occupies approximately half of one of the ship's decks and is the most heavily trafficked passenger area on the entire ship. The Lido Marketplace offers a variety of carving stations, salad bars, dessert bars, ice cream machines, ethnic food stations, and beverage dispensers. Within the Lido Marketplace is a food preparation and service area called the Mongolian Wok.

When asked about the floor's condition when she fell, Plaintiff stated that there was no foreign substance on the floor at the time of her fall. (Pl. Dep. 85:1-11.) When asked if grease or moisture contributed to her fall, Plaintiff stated, "Not that I could see." (*Id.* at 85:8-11.) When asked if she believed that there was water, moisture or some sort of liquid on the floor tiles, Plaintiff replied "Nothing. It would have stained the clothes or wet my clothes or something, no." (*Id.* at 86:15-19.)

*Defendant's Knowledge of Problems With the Lido Marketplace*

Prior to Plaintiff's fall, Defendant was aware of other slip and falls that had occurred in the Lido Marketplace and that contamination on the floor could lead to slip and falls. (Dominguez Dep. 16:25-17:6.) Defendant knew that the Lido Marketplace had more slip and falls than other ships. (*Id.* at 18:15-17.) Specifically, from its inaugural voyage until the month before Plaintiff's accident, the *Breeze* carried 474,448 passengers, all of whom probably passed through the Lido Marketplace at least twice a day during their cruises. During that same 28-month time period, 57 passengers reported slip and fall accidents in the Lido Marketplace. Knowing that the Lido Marketplace on the *Breeze* has had a higher number of slip and falls than

on other ships, Defendant has tried to figure out why and tried different ways to mitigate the number of accidents. (*Id.* at 18:20-19:2.) The issues with the Lido Marketplace flooring were a regular area of discussion aboard the ship. (*See* DE-56-1; 56-2; 56-3; 56-4; 56-9.)[1]

To that end, in July 2013, prior to Plaintiff's accident, Defendant hired a testing company, S.E.A., to evaluate the floor in the Lido Marketplace due to complaints about the slipperiness of the floor. (DE-56-5). The testing found that when wet,[2] three areas, of the five areas tested, fell below the industry standard by having a slip index value below 0.50. (*Id.* at 5.) Those areas were the area nearest the Mongolian Wok, the area near the Galley door, and the area on the food cart route. (*Id.*) The remaining areas tested had a slip index at or above 0.50 when wet. (*Id.*) The testing found that "the reduced slip-resistance may be the result of contamination from food preparation areas. Potential sources for this contamination include airborne grease from the woks in the cooking area and tracked grease from the floors of the galley." (*Id.*) The testing report further noted that "[e]nhanced cleaning to remove foodborne contamination may result in improved slip-resistance." (*Id.*)

*Defendant's Attempts to Resolve the Problem*

Defendant holds regular ship board safety meetings to discuss safety issues. It also holds broader corporate meetings addressing safety issues, particularly aimed at reducing fall incidents.

---

[1] Plaintiff has filed these documents in opposition to the Motion. However, most of the documents are untitled, appear to be portions of larger documents, do not indicate the date they were created, and do not set out the author or creator of the document. It appears that most, if not all, of the documents were created onboard the *Breeze*. However, who created them and the level of expertise of the creator/author is unknown. Consequently, at most the documents can be considered the opinion of an unknown worker aboard the *Breeze*.

[2] The testing was only done under wet conditions.

Shortly after S.E.A.'s testing and report, the *Breeze*'s Captain and Ship Manager made a decision to have a product applied to the floor tiles in the Lido Marketplace in September or October 2013. (Dominguez Dep. at 22:12-22.) The product, called Stanta, is supposed to help reduce slip and falls by increasing the grit of the tile. (*Id.* at 32:14-18.) After the initial application to certain areas, Defendant had the Stanta applied to all areas of the tile in the Lido Marketplace in July 2014. (*Id.* at 48:5-21; 80:17-23.) After the application of the Stanta, the number of slip and falls in the Lido Marketplace dropped. (*Id.* at 33:3-16; 81:5-10; Otrello Dep. 69:14-70:3.) Defendant, however, realized that the Stanta application was only a temporary solution. (Dominguez Dep. at 56:6-17.)

Around the time the Stanta was first applied, Defendant established a Floor Improvement Task Force. (*Id.* at 5-98:5-99:4.) Because the S.E.A. report indicated that the biggest issue with the floor was contamination, Defendant began looking at a product called "Wash and Walk" that would help reduce contamination, especially grease. (*Id.* at 58:7-14; 60:10-11.) While Defendant did not use Wash and Walk on the *Breeze* until after Plaintiff's accident, it began testing Wash and Walk's effectiveness on other ships. (*Id.* at 78:3-11; 79:6-11.) Defendant also continued to test the floor, monitor it, and try to maintain it in a dry condition to the extent possible. (*Id.* at 81:11-25; 105:8-18; Otrello Dep. 71:3-17.)

While the Ship Manager, Otrello, recommended replacing the tiles to reduce the slip and falls, Defendant had not yet considered it at the time of Plaintiff's accident. (Otrello Dep. 73:15-21; Dominguez Dep. at 145:18-25.) The Ship Manager believed that better grit tiles would solve the problem, but he is not an expert in the area. (Otrello Dep. 84:17-18.) In fact, he

4

"doesn't know anything about tiles." (*Id.* at 107:3-4.) The Ship Manager believed that the problem was not the tiles per se, but humidity and grease. (*Id.* at 102:6-13, 21-24.) According to the Ship Manager, the *Breeze* regularly uses yellow cones to warn passengers of slippery areas. (*Id.* at 130:15-131:3.)

*Plaintiff's Expert's Testing of the Flooring*

After Plaintiff filed suit, she obtained her own expert to test the flooring in the Lido Marketplace. His tests indicated that under dry conditions the flooring had an average slip resistance of 0.70 and 0.62, which is above the 0.60 which is required to establish a safe coefficient for level walking surfaces aboard ships. (DE-53-2 at 3.) Under wet conditions, the floor had an average slip resistance of 0.46 and 0.45, which is below the 0.50 that is considered a minimum requirement in terrestrial settings for dry and wet level walkway surfaces. (*Id.*) Plaintiff's expert concluded:

> Based on the foregoing it is apparent that there is a degradation of walkway surface slip resistance under wet conditions and that the degradation causes a reduction in slip resistance to below a minimally acceptable value of 0.60. It is the opinion of the writer that a dangerous floor condition will therefore exist in the walkway if there is contamination such as by liquid water. While these surfaces may be considered adequately slip resistant when dry, when wet the slip resistance falls below minimally safe values suited to safe pedestrian access.

(*Id.*)

*Plaintiff's Lawsuit*

As a result of Plaintiff's accident, she filed a single count complaint of negligence against Defendant. Plaintiff seeks punitive damages in addition to compensatory damages. Defendant moved to dismiss Plaintiff's claim for punitive damages. However, the motion was denied

because Plaintiff had adequately pled a claim for punitive damages. Defendant now seeks summary judgment on Plaintiff's claim for punitive damages because there is no record evidence that Defendant's actions were willful, wanton, or outrageous.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a

sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; see also *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. DISCUSSION

Defendant moves for summary judgment because Plaintiff cannot show that Defendant's actions were willful, wanton, or outrageous. Further, Plaintiff's own testimony coupled with her expert's findings establish that Defendant's actions do not rise to the level of willful, wanton, or outrageous conduct. Plaintiff maintains that Defendant had longstanding knowledge of the problems with the Lido Marketplace's floor's low slip resistance, which lead to an unreasonable safety risk for passengers. Plaintiff maintains that the record evidence shows that: (1) Defendant had actual knowledge of numerous accidents on the flooring before Plaintiff's accident; (2) the wrong tiles may have been selected for use in the Lido Marketplace; (3) Defendant had actual knowledge that the floors were defectively designed and constituted a serious safety hazard to passengers; (4) Defendant had actual knowledge that corrective action was necessary; (5) Defendant had actual knowledge of the low slip resistance of the floor; (6) Defendant deliberately failed to remediate the floor; and (7) Defendant deliberately concealed the condition from passengers.

First, and most importantly, there is no record evidence that the floor had a slip resistance below 0.6 when dry. Plaintiff's own expert tested the floor and found that when dry the floor had an average slip resistance of 0.70 and 0.62, both above the industry standard of 0.60 for a dry floor. In fact, Plaintiff's expert stated that "these surfaces may be considered adequately slip resistant when dry." Defendant's prior testing of the floor had only been under wet conditions.

Thus, there is no record evidence that when dry, the slip resistance fell below the industry standard.

Second, and almost as importantly, there is no record evidence that the floor was wet or otherwise had a foreign substance on it at the time of Plaintiff's accident. Plaintiff testified that she believes that there was nothing on the floor - no water, moisture, or other liquid on the tile - at the time of her accident. No other record evidence has been produced indicating that there was anything on the floor at the time and place where Plaintiff fell. While Plaintiff testified that she thought the floor was "slippery," such testimony does not mean that there was anything on the floor or that the floor did not have an adequate slip resistance. Even if Plaintiff's testimony that the floor was "slippery" in the area where she fell constitutes evidence that there was something on the floor, the record evidence indicates that prior to Plaintiff's fall, Defendant's knowledge was that the problem areas of the floor were limited to three areas, near the Mongolian Wok, near the Galley door, and on the food cart route, and did not include the area where Plaintiff fell.

Third, while there is no question that Defendant had concerns about the floor and the number of slip and falls that occurred in the Lido Marketplace,[3] there is record evidence that Defendant took steps to ensure that the floor remained safe. After Defendant discovered that certain areas can easily become contaminated with food and grease, and thereby reduce the slip

---

[3] Plaintiff relies heavily on a document that she identifies as the 2013 Environmental Occupational Safety Records for the *Breeze*, DE-56-1. That document states that the Lido Marketplace tile "are [sic] serious safety hazard and is an engineering and design defect that should be fixed." However, there is no record evidence as to what this document actually is or who prepared it. Thus, it is not clear that the writer of the document had any expertise in the area to actually conclude that the tiles created an engineering and design defect. Consequently, this document, at most, establishes that Defendant knew there were safety issues with the tiles in the Lido Marketplace.

8

resistance, the Ship Manager and Captain had an anti-slip coating applied to the problem areas of the floor. That same coating was later applied throughout the Lido Marketplace. After that Defendant continued to monitor the situation and even formed a task force to address issues with the floor. Defendant learned of a product that would help remove contamination, particularly grease, and began testing it on two ships. Before Defendant had a chance to start using the product on the *Breeze*, Plaintiff had her accident.

The character of conduct that will support an award of punitive damages "must be of 'gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects.'" *Boney v. Carnival Corp.*, 2009 WL 4039886, at *2 (S.D. Fla. Nov.20, 2009) (quoting *Chrysler Corp. v. Wolmer*, 499 So.2d 823, 824 (Fla.1986)). Defendant's actions simply do not rise to this level. The record evidence indicates that Defendant took actions, and continued to take action, to try to improve the safety of the floor. Further, the area where Plaintiff fell was not a known problem area. While Defendant may have been able to do more to prevent accidents, its attempts at trying to prevent them were not so meager as to amount to a gross and flagrant disregard for the safety of persons. Consequently, Defendant's actions do not amount to willful, wanton, or outrageous conduct. Therefore, Plaintiff's request for punitive damages must be dismissed. Accordingly, it is

ORDERED that Carnival's Motion for Partial Summary Judgment on Plaintiff's Claim for Punitive Damages [DE-53] is GRANTED. Plaintiff's request for punitive damages is dismissed.

DONE AND ORDERED in Miami, Florida, this 9th day of March, 2016.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   All counsel of record